Michael JOHNSON *v.* CITY OF KENSETT

CR 89-187                                          787 S.W.2d 651

Supreme Court of Arkansas
Opinion delivered March 26, 1990
[Rehearing denied April 23, 1990.*]

---

*Hays, J., would grant rehearing.

*Hughes & Hughes, P.A.*, by: *Teresa L. Hughes*, for appellant.

*Steve Clark*, Att'y Gen., by: *Joseph V. Svoboda*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. The issue in this appeal is whether the charge brought against the appellant, Michael Johnson, was invalid because of the failure of the officer who brought the charge to meet certain minimum qualifications of the Law Enforcement Standards Act. We hold that, because the personnel file of the officer contained no recommendation by a psychological examiner and no completed fingerprint check as required by law, the charge the officer brought against Johnson was invalid, therefore, the conviction is reversed and the case dismissed.

Johnson was convicted in municipal court of driving while intoxicated. The conviction was appealed to circuit court. At the circuit court *de novo* trial, Johnson moved to suppress the evidence resulting from his arrest and for dismissal on the basis of failure of compliance with the Law Enforcement Standards Act, Ark. Code Ann. §§ 12-9-101 through 12-9-404 (1987).

Section 12-9-108(a) provides:

> A person who does not meet the standards and qualifications set forth in this subchapter or any made by the Arkansas Commission of Law Enforcement Standards and Training shall not take any official action as a police officer, and any action taken shall be held as invalid.

In its regulation 1002, entitled "Minimum Standards for Employment or Appointment," the commission has provided:

> (1) Verification of minimum employment standards must be contained in the permanent personnel file which is maintained by the employing department.

> (2) Every officer employed by a law enforcement unit shall:

. . .

(c) Be fingerprinted and a search made of state and national fingerprint files to disclose any criminal record. Procedure is prescribed in Specification S-2, Fingerprint Record Check.

. . .

(i) Be examined by a licensed psychiatrist or licensed psychologist, who, after examination, makes recommendations to the employing agency. (See specification S-7.)

. . . .

Specification S-2, pertinent to the fingerprint requirement, provides:

PROCEDURES: 3. The original copies of all fingerprint record checks and results will be placed in the applicant's permanent personnel file and will be available for examination at any reasonable time by representatives of the Commission. Record checks will be maintained regardless of the results of such inquiry.

Specification S-7, pertinent to the psychological examination, states:

REQUIREMENT: (1) All applicants will be examined to determine emotional stability.

PROCEDURES: (1) An actual interview and psychometric evaluation will be utilized.

(2) The result of the evaluation will be recorded. A report of the evaluation will be forwarded to the employing agency along with the Confirmation of Psychological Evaluation Form, F-2b. This form will be signed by the examiner designating the applicant as being Recommended or Not Recommended. . . .

The evidence as to whether Johnson was driving under the influence of alcohol at the time he was arrested and charged was stipulated, and it was ample to support a conviction. Other

evidence taken at the trial revealed that, at the time he was hired, the personnel records of Officer Branch, who had arrested and charged Johnson by citation, contained no fingerprint report. Testimony of the Kensett police chief indicated that the fact that the fingerprint record was not in the file was not questioned until after this case arose. The chief testified he made some calls to try to locate the records on October 3, 1988. The incident in question here occurred September 10, 1988. The chief eventually discovered that the records had inadvertently been sent by the FBI to the White County Sheriff's Office rather than the Kensett Police Department which employed Branch.

A psychological examination report dated June 25, 1987, was introduced as an exhibit. No abstracted testimony indicates whether it was in Branch's personnel file on September 10, 1988. The report seemed to be an entirely favorable description of Officer Branch's personality, and said "[h]e appears to have the capacity to function well as a police officer," but it contained no direct recommendation, either way, on employment of Branch as a police officer.

Harold Webb, a standards specialist with the Arkansas Commission on Law Enforcement Standards testified that even though the form 2-B containing the psychological report and recommendation had not been forwarded to his agency for purposes of the certification process an officer might still be eligible to make arrests. He stated his opinion, however, that, "If he doesn't have the paper (Form 2-B) showing he's recommended on file at his agency and it doesn't clearly show he was recommended for law enforcement employment, then his arrests would not be valid."

As we pointed out in *Grable v. State*, 298 Ark. 498, 769 S.W.2d 9 (1989), we are not concerned with the legality of the arrest because an illegal arrest is not, standing alone, a basis for reversal of a conviction. The real controversy here, as in the *Grable* case, is whether Officer Branch had authority to charge Johnson with an offense. There is no evidence of any other charge having been made.

In the *Grable* case we held that there must be strict compliance with the standards for hiring law enforcement officers, and we took the general assembly at its word to the effect

that failure of compliance required us to hold an official act by the officer invalid. The state argues here that in *Mitchell* v. *State*, 298 Ark. 536, 769 S.W.2d 18 (1989), which was decided the same day as the *Grable* case, we took back our statement and held that substantial compliance would be sufficient. We do not read the *Mitchell* case as being inconsistent with the *Grable* case. Both required strict compliance.

With respect to the failure of compliance regarding the fingerprint check, the state attempts to distinguish the *Grable* case by arguing that here the check had been completed but was just lost, whereas in the *Grable* case the check had only been initiated but not completed. It is argued that for the court to hold there was a lack of compliance in this case would "provide a whole new meaning to the concept of 'form over substance.' "

■ The stated purpose in requiring completion of the fingerprint check prior to employment of a police officer is to ascertain whether he or she has a criminal record. Here it is clear that there was no compliance with that requirement and Officer Branch was hired "in the dark." We take seriously the state's "form over substance" argument, but we cannot understand how the failure in this instance could be regarded as an unimportant or "formal" one. The Kensett Police Department had no knowledge whether the fingerprint check had been completed or what it might have revealed. We cannot regard the requirement in this circumstance as being directory rather than mandatory; it goes to the heart of the purpose of the requirement. *See* N. Singer, *Sutherland Statutory Construction*, § 57.12 (4th ed. 1984).

■ The same is true of the psychological report. Again, the record as abstracted does not show that there was any such report in Officer Branch's personnel file at the time he charged Johnson. Even if the report introduced as an exhibit had been in the file, however, it would have been insufficient. The point is well illustrated by our opinion in *Freeman* v. *City of DeWitt*, 301 Ark. 581, 787 S.W.2d 658 (1990), which we also hand down this date. In that case, there was a psychological report which anyone could read as being unfavorable to the officer in question. Yet it was argued that the existence of the report, despite its lack of a recommendation, favorable or unfavorable, was sufficient. We cannot say that the failure of the report to make a recommenda-

tion is an inconsequential lapse. Compliance with the simple requirement of a recommendation will prevent courts and other government agencies from having to make professional psychological judgments, for which we and they are so obviously unqualified, based on reports which might otherwise be inconclusive.

■ Finally, the state argues that, by Act 44 of 1989, the general assembly has made clear its intention that failure to comply with the law enforcement standards is not a basis for invalidating an officer's acts. Johnson argues application of the Act in his case would violate the constitutional prohibition against *ex post facto* legislation. As stated in the *Freeman* case, we do not reach that issue because it was not raised in the trial court.

Reversed and dismissed.

Hays, J., dissenting.

Price, J., not participating.

Steele Hays, Justice, dissenting. I believe the majority is further expanding a strict compliance interpretation of the Law Enforcement Standards Act [Ark. Code Ann. §§ 12-9-101 — 404 (1987)] when there are sound and persuasive reasons for taking a less rigid approach. I respectfully disagree.

In *Grable* v. *State*, 298 Ark. 489, 769 S.W.2d 9 (1989), the fingerprint search had not been completed at the time of the arrest and in both *Grable* and *Mitchell* v. *State*, 298 Ark. 536, 769 S.W.2d 18 (1989), the psychological examinations had not even been performed. In contrast, here the fingerprint search had been completed without a blemish on Officer Branch's record and the psychological examination was entirely favorable and the variance in the form of the psychological report was not in the least material. It is obvious that Officer Branch was recommended for employment.

The majority concludes that Branch was hired "in the dark," but the record tells us nothing as to whether the City of Kensett hired Branch without knowing whether his fingerprint search was favorable. The state police fingerprint report was completed on July 9, 1987, and the FBI report on July 27, some six weeks before

the arrest, but both were incorrectly filed with the Office of the White County Sheriff at Searcy. Whether Kensett had knowledge one way or the other is not in the record. It is clear the appellant did not argue to the trial court that Branch was hired without knowledge that his prior record was clear, the only argument was that the fingerprint check was not in his file on September 10, 1987, the date of the arrest. Near the close of a hearing the trial court specifically asked counsel if it was the defendant's position that the arresting officer was not qualified because the fingerprint report was not in his personnel file in Kensett and the answer was "yes."[1]

As to the psychological evaluation, the report consisted of a lengthy narrative (see appendix) concluding with the following:

*Test Results*:

Results of psychological testing reveal him to be high in poise, self-assurance, maturity, responsibility, and achievement potential. He particularly may be expected to display the following behaviors from time to time: persistent, planful, forceful, enterprising, enthusiastic, persuasive, alert, thorough, industrious, honest, practical, tolerant, helpful, tactful, reliable, and efficient.

*Summary and Conclusions*:

In summary, Mr. Branch was seen for a psychological evaluation to fulfill requirements of minimum standards and to determine suitability to function as a law enforcement officer. *He displays no atypical behavior upon interview and test results indicate that he is high in measures of poise, maturity, responsibility, and achievement potential. He appears to have the capacity to function well as a law enforcement officer.* It would be to his advantage to further his education as he is able. [Emphasis supplied.]

That the examiner deemed Officer Branch psychologically well suited for employment cannot be seriously doubted and it is of little consequence that the report was not on form 2-B and

---

[1] Record, pp. 92-93.

omitted a specific recommendation.

In *Mitchell* and *Grable* we examined the language of Section 12-9-108(a), which provides that persons who do not meet the standards and qualifications shall not take any official action as a police officer, and "any action taken shall be held as invalid." We took that wording to mean that strict compliance was required, that substantial compliance would not be consistent with the obvious intent of the General Assembly to improve the quality of law enforcement. *Grable* v. *State*, 298 Ark. 489, 769 S.W.2d 9 (1989) at 493.

However, the *Grable* and *Mitchell* decisions were soon followed by Act 44, amending "ab initio" Ark. Code Ann. § 12-9-108(a) to read:

> Actions taken by law enforcement officers who do not meet all the standards and qualifications set forth in this subchapter or made by the Arkansas Commission on Law Enforcement Standards Training shall not be held invalid merely because of the failure to meet the standards and qualifications.

The majority declines to consider the effect of Act 44 because it was not raised in the trial court. But that disregards the settled rule that we affirm the trial court if it reached the right result irrespective of the reason.

The fundamental rule in construing statutes is to ascertain and give effect to the intention of the legislature. *State, ex rel.* v. *K.C. & M. Ry. & B. Co.*, 117 Ark. 606, 174 S.W. 248 (1914); *Brown* v. *Nelms*, 86 Ark. 368, 112 S.W. 373 (1908). I do not suggest that Act 44 is conclusive as to our earlier interpretation of § 12-9-108(a), but when a former statute is amended or a doubtful meaning clarified by subsequent legislation, the later expression may be considered in determining the legislative intent. 2A N. Singer, *Sutherland Statutory Construction* § 49.11 (1984). The legislative intent is to be determined by a consideration of all legislation — prior, contemporaneous and subsequent, bearing on the meaning of the subject legislation. *Phillips Petroleum* v. *Heath*, 254 Ark. 847, 497 S.W.2d 30 (1973), and while an earlier interpretation of the legislative intent cannot be overriden by subsequent legislation, such expressions are entitled

to "significant weight," particularly when a precise intent of the enacting body is obscure. *Seatrain Shipbuilding Corp.* v. *Shell Oil Co.*, 444 U.S. 572 (1980).

From that standpoint, I believe the appropriate interpretation of the Law Enforcement Standards Act requires substantial, rather than strict, compliance. That being so, the trial court did not err in holding that the misplacement of a completed fingerprint search evidencing no criminal record, and a clearly favorable psychological evaluation, did not defeat substantial compliance with the act.

Even if this court chooses to adhere to a strict compliance approach, we have recognized that a rigid adherence is not required. Strict compliance is tantamount to a holding that the provisions of a statute are mandatory. *See* N. Singer, 2A *Sutherland Statutory Construction* § 57.12 (4th ed. 1984). If, on the other hand, a provision is said to be directory, some deviation is allowed without thwarting the result dictated by the statute. *Id.* Whether less than absolute compliance with particular provisions is permitted is a matter of statutory construction and the result of interpretation. *Id.*

According to *Sutherland*, whether a provision is mandatory or directory is determined as follows:

> [The courts] must consider the importance of the literal observance of the provision in question to the object of the litigation. If the provision is essential, it is mandatory. A departure from it is fatal to any proceeding to execute the statute or to obtain the benefit of it. . .
>
> . . .This determination involves a decision of whether the violation is serious enough to invalidate acts or proceedings pursuant to the statute.
>
> In cases where no apparent actual or potential injury results to anyone from the failure to adhere to the provisions of a statute, a directory construction usually prevails in the absence of facts indicating a mandatory construction was intended. Statutory requirements that are the essence of the thing required by statute are mandatory, while those things which are not of the essence are directory. *Sutherland, supra*, § 57.01; 57.03.

Thus, those things that are of the essence of the thing to be done are mandatory, while those things not of the essence of the thing to be done are directory only. *Taggart & Taggart Seed Co.* v. *City of Augusta*, 278 Ark. 570, 647 S.W.2d 458 (1983); *Edwards* v. *Hall*, 30 Ark. 31, 37 (1875).

We faced an analogous situation in applying Act 568 of 1969, the new Jury Wheel Act. In *Horne* v. *State*, 253 Ark. 1096, 490 S.W.2d 806 (1973), we held the act was mandatory. But as varying issues arose under the act, we recognized that some provisions were more important than others and not all provisions were mandatory. In *Huckaby* v. *State*, 262 Ark. 413, 557 S.W.2d 875 (1977), and *Harrod* v. *State*, 286 Ark. 277, 691 S.W.2d 172 (1985), we held some provisions were merely directory, and substantial compliance was sufficient.

It seems obvious in this case that the requirement that the officer's fingerprint checks be maintained in his personnel file is intended to facilitate the *implementation* and *supervision* of the Standards Act, and does not affect in any material way the legislative objective of law enforcement officers possessing the minimum prescribed qualifications, nor has the appellant suggested how it could be otherwise. Consequently, a failure to strictly follow the dictates of a supplementary specification dealing with the filing of the fingerprint report, or the form by which the psychological evaluation is submitted, should not come within the purview of § 12-9-108(a), as constituting a failure of the officer to meet the standards and qualifications set forth by the Commission. I would affirm the judgment.

602

*Don Birmingham, Ph. D.*

CONSULTING AND PSYCHOLOGICAL SERVICES

P S Y C H O L O G I C A L    E V A L U A T I O N

Name: Willie Arthur Branch, Sr.          Date of Evaluation: June 24,
DOB : 4-30-1944                          Date of Report:    June 25,

**Purpose:** The purpose of this evaluation is to facilitate in the determinati
of suitability for employment as a law enforcement officer and to meet minit
standards of the Commission on Law Enforcement for the State of Arkansas. T
evaluation consisted of a clincal interview lasting approximately one hour i
cluding history-taking regarding educational, marital and occupational backg
In addition, a standard personality questionnaire was administered to Mr. Br

**Relevant History:** Mr. Branch was born and reared in Jackson County. His fa
is deceased and he was raised by his grandparents with his grandfather being
employed as a farmer for some 50 years. Mr. Branch graduated in 1962 from
nan High School. He has 2 years of college at Arkansas State University at
work history is very stable and it is noted that he spent 8 years in the Ar
Services and received an honorable discharge. He also has been employed fcr
the past 9 years and continues to be employed at Bryce Corporation in Searc
He has been married to his present wife for 22 years and they have 7 childre

His goals are to eventually pursue a law enforcement career full-time. He p
ticularly enjoys working with children and adolescents.

**Appearance and Behavior:** Mr. Branch is a medium built 43 year old black mal
who looks his stated age. He was casually and appropriately dressed for thi
interview with grooming and hygiene being good. He related well and appeare
to comfortable and relaxed in my presence. He displayed no atypical behavior
He is of obvious average intelligence.

**Test Results:** Results of psychological testing reveal him to be high in pois
self-assurance, maturity, responsibility, and achievement potential. He part
larly may be expected to display the following behaviors from time to time:
persistent, planful, forceful, enterprising, enthusiastic, persuasive, alert,
thorough, industrious, honest, practical, tolerant, helpful, tactful, reliabl
and efficient.

**Summary and Conclusions:** In summary, Mr. Branch was seen for a psychological
evaluation to fulfill requirements of minimum standards and to determine suit
ability to function as a law enforcement officer. He displays no atypical be
upon interview and test results indicate that he is high in measures of poise
maturity, responsibility, and achievement potential. He appears to have the
capacity to function well as a law enforcement officer. It would be to his ac
tage to further his education as he is able.

Sincerely,

Don Birmingham, Ph.D.
Psychologist

mb

**PLAINTIFF'S
EXHIBIT**
*2*